**AFFIRMED; Opinion Filed August 27, 2019.**



**In The**

# Court of Appeals
# Fifth District of Texas at Dallas

**No. 05-18-00579-CV**

**AEROTEK, INC. AND J.R. BUTLER, INC., Appellants**
**V.**
**LERONE BOYD, MICHAEL MARSHALL, JIMMY ALLEN, AND TROJUAN CORNETT, Appellees**

**On Appeal from the 95th District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-18-00907**

## OPINION

Before Justices Bridges, Partida-Kipness, and Carlyle
Opinion by Justice Carlyle

In this interlocutory appeal, appellants Aerotek, Inc. ("Aerotek") and J.R. Butler, Inc. challenge the trial court's order denying their motion to compel arbitration of employment-related claims asserted against them by appellees Lerone Boyd, Michael Marshall, Jimmy Allen, and Trojuan Cornett. Specifically, they focus on the legal sufficiency theory that their *Tipps*[1] hearing evidence conclusively established the opposite of appellees' claims they never saw and e-signed an arbitration agreement because this was physically impossible.[2] We affirm the trial court's order.

---

[1] *Jack B. Anglin Co., Inc. v. Tipps*, 842 S.W.2d 266, 269 (Tex. 1992) (orig. proceeding).

[2] *See City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005) ("'No evidence' points must . . . be sustained when the record discloses . . . the evidence establishes conclusively the opposite of the vital fact." (quoting Robert W. Calvert, *"No Evidence" & "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 362–63 (1960))).

# I. Background

Aerotek is a staffing company whose corporate clients include J.R. Butler, Inc. Appellees filed this lawsuit against appellants alleging race discrimination, harassment, and retaliation pertaining to appellees' 2017 employment on a J.R. Butler, Inc. construction project in Plano, Texas. Each appellant filed a separate general denial answer. Aerotek filed a motion to compel arbitration, asserting "there is no question" that all four appellees "entered into an agreement to arbitrate" the claims alleged in the petition. J.R. Butler, Inc. joined. Appellees responded that they never saw or digitally signed the arbitration agreements and thus there was no valid agreement to arbitrate, requiring the trial court to deny the motion to compel arbitration. Appellees attached individual declarations to their response. As relevant, the declarations of Boyd, Marshall, and Cornett stated:[3]

> 5. At the time I was retained by Aerotek, I was required to review and agree to certain terms, conditions, policies and/or procedures of Aerotek.
> 6. I reviewed these terms, conditions, policies and/or policies online and signed these electronically.
> 7. After I filed this lawsuit, Aerotek produced an arbitration agreement that purports to bear my digital signature.
> 8. A copy of this document is attached to my declaration as Exhibit 1.
> 9. I had never seen this document before it was produced after this lawsuit was filed.

---

[3] Allen's declaration stated in part:

> 5. At the time I was retained by Aerotek, I told Sybil Harper I was not computer savvy.
> 6. Ms. Harper then went through and signed all my paperwork electronically while I sat with her.
> . . . .
> 8. After I filed this lawsuit, Aerotek produced an arbitration agreement that purports to bear my digital signature.
> 9. A copy of this document is attached to my declaration as Exhibit 1.
> 10. I had never seen this document before it was produced after this lawsuit was filed.
> 11. I did not sign any document, electronically or otherwise, providing my agreement to arbitrate claims against Aerotek or any of its customers.
> 12. I was not presented with any document, electronically or otherwise, providing my agreement to arbitrate claims against Aerotek or any of its customers.
> 13. I was never told, verbally or in writing, that I was consenting, would be consenting, would be required to consent, or had consented, to arbitrate any claims against Aerotek or any of its customers.
> 14. I was never presented with any document, electronic or otherwise, that stated I was consenting, would be consenting, would be required to consent, or had consented, to arbitrate any claims against Aerotek or any of its customers.
> 15. I was never told anything about arbitration, and no one from Aerotek or any other Defendant ever mentioned arbitration to me before this lawsuit was filed.
> 16. I was never presented with any document, electronically or otherwise, that mentioned arbitration.
> 17. None of the terms, conditions, policies and/or procedures of Aerotek that I reviewed and agreed to online mentioned arbitration.
> 18. Exhibit 1 was not one of the terms, conditions, policies and/or procedures of Aerotek that I reviewed.

10. I did not sign any document, electronically or otherwise, providing my agreement to arbitrate claims against Aerotek or any of its customers.

11. I was not presented with any document, electronically or otherwise, providing my agreement to arbitrate claims against Aerotek or any of its customers.

12. I was never told, verbally or in writing, that I was consenting, would be consenting, would be required to consent, or had consented, to arbitrate any claims against Aerotek or any of its customers.

13. I was never presented with any document, electronic or otherwise, that stated I was consenting, would be consenting, would be required to consent, or had consented, to arbitrate any claims against Aerotek or any of its customers.

14. I was never told anything about arbitration, and no one from Aerotek or any other Defendant ever mentioned arbitration to me before this lawsuit was filed.

15. I was never presented with any document, electronically or otherwise, that mentioned arbitration.

16. None of the terms, conditions, policies and/or procedures of Aerotek that I reviewed and agreed to online mentioned arbitration.

17. Exhibit 1 was not one of the terms, conditions, policies and/or procedures of Aerotek that I reviewed and agreed to online.

At the evidentiary hearing on the motion to compel arbitration, Aerotek presented testimony of Phaedra Marsh, an Aerotek program manager, and Sybil Harper, an Aerotek administrative assistant. Marsh, a near-twenty-year Aerotek employee, testified in part (1) "the onboarding technology application that we utilize is something that I worked with our IS department to design and develop"; (2) "I also manage that technology currently, meaning that any time there are any updates or any enhancements that we make to the tool, any training that we provide our internal employees, I'm responsible for that"; and (3) she is "familiar with" and "capable of explaining" the "process that Aerotek utilizes for onboarding candidates for potential positions with Aerotek's clients."

Marsh described the online onboarding process and simultaneously demonstrated each step on a laptop computer connected to a monitor visible to the trial court.[4] During that demonstration, Marsh stated in part (1) in order to begin completing the electronic paperwork, the candidate must

---

[4] Our record does not contain a visual reproduction of this demonstration. Even had Aerotek presented us video evidence of the in-court demonstration, this would only show what happened in the system that day in court. It would likely not prove, absent other evidence not present here, the physical impossibility of appellees' sworn denials.

click on a hyperlink sent to him by Aerotek and create a "unique user ID," a password, and security questions; (2) the first "task" in the paperwork process is to "acknowledge and electronically sign" an "Electronic Disclosure Agreement," in which the candidate agrees "to use an electronic signature in lieu of a hand-written signature" throughout the process; (3) "[t]he paperwork has to be completed in the order that it's presented"; (4) when a particular section of the paperwork is "open," "the additional sections are all locked, and these sections will remain locked until the candidate completes this first section and each section going forward"; (5) the system "doesn't allow [candidates] to get out of order in completing their paperwork"; (6) "[w]hen they're electronically signing, it's . . . time and date stamping the time in which they signed that particular document"; (7) in the "policies and procedures section," "the first five documents open up automatically and can be completed . . . in any general order"; (8) one of those "first five documents" in that section is a "Mutual Arbitration Agreement"; (9) candidates cannot "get to th[e] last step in the process of finalizing and submitting the data without completing each and every single one of the steps"; and (10) the process described by her "is the only online process" used by Aerotek for completing employment paperwork.

Further, Marsh stated the system allows Aerotek to view data respecting whether a candidate "has completed this process." Marsh demonstrated that feature by accessing onboarding data pertaining to Boyd on the laptop computer described above. She testified the data pertaining to Boyd showed (1) "all the documents were signed in order of this process" and (2) the "time stamp" respecting the mutual arbitration agreement pertaining to Boyd "says 11/22 at 11:02 a.m."

During Marsh's testimony, Aerotek offered into evidence four individual "Electronic Disclosure Agreements" and four individual "Mutual Arbitration Agreements," each bearing a non-handwritten notation describing a date and time appellees purportedly "electronically signed"

them. Those documents were admitted into evidence without objection. Additionally, Marsh testified,

> Q. Do you know of any other way that that name could appear on that disclosure document or any of the others that are in your hand if an individual didn't go online and go through the process that you've described for the Court?
>
> A. You know, not that I can think of. I mean, they receive the invitation themselves. They create an account. They sign and attest that this is who they are, so—
> . . . .
> Q. So if these individuals did what they said in their affidavit and they went online, they went through the process, they reviewed the terms and conditions, policies and procedures and they affixed electronic signatures as they said they did and they submitted the information to Aerotek, is there any possible way that you can imagine that they could have done that without executing the arbitration agreement?
>
> A. Not with this process. It's locked throughout the process, so they have to complete everything in that section before they can get to the finalize and submit section. So everything has to be signed and completed before they get there.

During cross-examination, Marsh admitted,

> I am not currently in IT. I work with our IT department to manage this process.
>
> Q. All right. I thought I heard you say earlier that you helped create this process.
>
> A. Yes, with our IT department.
>
> Q. So you're not the person who created the computer system itself?
>
> A. No.
>
> Q. Who is that person?
>
> A. This is an application that we purchased from a vendor called Smart ERP, and we utilized our IT department to attach it to our HRIS system. It's an add-on to our HRIS system, so I worked with the vendor as well as IT to build out all the forms that are in this process.
>
> Q. So let me see if I understand this. You helped create the forms that they then turned into a digital onboarding process?
>
> A. The forms were already in existence on paper per—previous to this, and so we took those forms that were on paper, and we built them out into this process. That's already established from the vendor.

Q. So let me get this straight. None of the computer programming that goes into this onboard processing, you didn't do any of that?

A. I did not do any of that.

Q. And is—are any of those people here today?

A. No.

Q. All right. Well, do you consider yourself an IT expert?

A. An IT expert, no. I don't do the development of this, but I have done all the testing on this system.
. . . .
Q. Have you ever seen a computer glitch?

A. Yes.

Q. Have you ever had your online system crash?

A. It's gone offline, yes.

Q. So you've seen glitches in that system before?

A. Yes.
. . . .
THE COURT: Let's see. Do you have the—you or the company, anyone with the company, have—have the ability to alter forms that are submitted?
. . . .
[MARSH]: No. We don't have the ability to alter them after they're submitted. If an update needs to be made, it's only added to the invitations launched going forward.

THE COURT: What, if any, glitches have you had with this system in the last four or five years?

[MARSH]: Um, there have been times where we've changed over—you know, we have four different servers that houses the data when we launch the invitation. And sometimes if one of those servers goes down, a candidate is not able to click on the link that takes them into the invitation. So they're unable to do their paperwork, but then once the serves [sic] comes back up, they can click on the link and do their paperwork.

Sybil Harper testified that in March 2017, she was an administrative assistant at Aerotek and her job duties included "helping people with their online paperwork." Harper stated she has no recollection of Allen or any dealings with him, but "very well could have met with him" during

that time. Further, she testified (1) she has assisted Aerotek candidates with their online onboarding paperwork "[p]robably at least a hundred times"; (2) she has a "very strict" and "very structured" process for doing so; (3) she sits with the candidate in a computer lab in Aerotek's office lobby and "talks to them through this process"; (4) the candidate has the option of typing their information themselves or allowing her to input information provided by them; (5) "[i]t's a process that requires things to be unlocked" and she does not have the ability to "bypass any of the locks"; (6) she asks the candidate for his consent before proceeding to the next step; and (7) she has never "electronically attached someone's signature to any document, arbitration agreement or any other document in this process without ensuring that they agreed to having [her] do so." On cross-examination, Harper stated in part, "I actually don't know what arbitration is . . . , but I just know that when we are trained on these things as far as the onboarding process, these are things that we need to make sure that we are making our candidates aware of."

Following that hearing, the trial court signed an order that stated in part (1) at the hearing, the parties "agreed that the declarations of Plaintiffs, attached to Plaintiffs' Response to Aerotek's Motion to Compel Arbitration, would be considered the same as live testimony as if provided in Court under oath, and that Defendant Aerotek waived any objections to the declarations on grounds that the testimony was not in proper format or was hearsay," and (2) "[t]he Court therefore accepts the declarations of Plaintiffs . . . and any attachments thereto . . . as if such testimony had been presented live in Court." The trial court also signed an order denying the motion to compel arbitration that stated in part "the Parties agreed that the declarations of Plaintiffs, . . . and any attachments thereto, would be considered the same as live testimony as if provided in Court under oath, and that Defendant Aerotek waived any objections to the declarations on grounds that the testimony was not in proper format or was hearsay." This interlocutory appeal timely followed.

## II. Denial of motion to compel arbitration

We review a trial court's order denying a motion to compel arbitration for abuse of discretion. *See Henry v. Cash Biz, LP*, 551 S.W.3d 111, 115 (Tex. 2018), *cert. denied*, 139 S. Ct. 184 (2018). We defer to the trial court's factual determinations if they are supported by evidence but review its legal determinations de novo. *Id*.; *see also Sidley Austin Brown & Wood, L.L.P. v. J.A. Green Dev. Corp.*, 327 S.W.3d 859, 863 (Tex. App.—Dallas 2010, no pet.) (explaining that in reviewing denial of motion to compel arbitration, "we apply a no-evidence standard to the trial court's factual determinations and a de novo standard to legal determinations"). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). There is no abuse of discretion when the court's decision is based on conflicting evidence, some of which reasonably supports the decision. *RSR Corp. v. Siegmund*, 309 S.W.3d 686, 709 (Tex. App.—Dallas 2010, no pet.).

A party seeking to compel arbitration must establish the existence of a valid arbitration agreement and that the claims at issue fall within the scope of that agreement. *Henry*, 551 S.W.3d at 115; *see also J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 227 (Tex. 2003) (although strong presumption favors arbitration, "the presumption arises only after the party seeking to compel arbitration proves that a valid arbitration agreement exists"). Motions to compel arbitration are ordinarily decided in summary proceedings "on the basis of affidavits, pleadings, discovery, and stipulations." *Kmart Stores of Tex., L.L.C. v. Ramirez*, 510 S.W.3d 559, 565 (Tex. App.—El Paso 2016, pet. denied after merits briefing) (quoting *Tipps*, 842 S.W.2d at 269). Where a party seeking to compel arbitration provides competent, prima facie evidence of an arbitration agreement, and the party seeking to resist arbitration contests the agreement's existence and raises genuine issues of material fact by presenting affidavits or other such evidence as would generally be admissible in a summary proceeding, the trial court must forego summary disposition and hold an evidentiary

hearing. *Id*. Where the trial court conducts such a "*Tipps* hearing" and thereafter makes a ruling, we review the trial court's findings for legal sufficiency. *Id*.

In a nonjury proceeding where, as here, no findings of fact or conclusions of law are filed or requested, we infer that the trial court made all the necessary findings to support its judgment. *Id*.; *see also Holt Atherton Indus. Inc. v. Heine*, 835 S.W.2d 80, 83 (Tex. 1992). If the implied findings are supported by the evidence, we must uphold the trial court's judgment on any theory of law applicable to the case. *Kmart*, 510 S.W.3d at 565; *see also Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990).

When reviewing the evidence for legal sufficiency, we consider the evidence in the light most favorable to the challenged finding, crediting favorable evidence if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not. *City of Keller*, 168 S.W.3d at 807. Evidence is legally insufficient if the record reveals: (a) the complete absence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact. *Id*. at 810. Evidence is legally sufficient if it would enable fair-minded people to reach the verdict under review. *Id*. at 827. When conducting a review of the legal sufficiency of the evidence, we are mindful that the factfinder was the sole judge of the credibility of the witnesses and weight to be given their testimony. *Id*. at 819.

In its sole issue on appeal, Aerotek asserts,

> [T]he trial court abuse[d] its discretion by finding that Mutual Arbitration Agreements were missing from the online onboarding paperwork reviewed, electronically signed, and submitted by all four Contractors, where the evidence at the *Tipps* hearing was that a job candidate using Aerotek's online onboarding system cannot possibly submit any onboarding paperwork without electronically signing a Mutual Arbitration Agreement, and the only evidence to the contrary was the Contractors' own affidavits stating that the arbitration agreement was not included.

Our sister court's opinion in *Kmart* is instructive. *See* 510 S.W.3d at 559. The sole issue on appeal was whether the evidence conclusively established an employee assented to an arbitration agreement. *Id*. at 564. Norma Ramirez sued her former employer, Kmart, alleging disability discrimination. Kmart moved to arbitrate based on an agreement Ramirez purportedly acknowledged through Kmart's online employee portal and accepted by continuing to work for the company. *Id*. at 562. In support of that motion, Kmart provided affidavit testimony of its compliance programs manager, Roberta Kaselitz, and several electronic records. *Id*. Kmart's evidence described the steps an employee was required to take to access and acknowledge Kmart's arbitration policy, including entering a user ID and password information and following hyperlinks. *Id*. at 562–63. Also, Kaselitz testified Kmart's electronic records indicated that Ramirez's log-in information was used on a specific date to access and acknowledge an arbitration agreement with Kmart. *Id*. at 563, 568. In response, Ramirez stated in an affidavit that she did not log onto Kmart's network on the date in question "except to clock in for work" and had never electronically acknowledged or agreed to any arbitration agreement. *Id*. at 563. The trial court then held an evidentiary hearing. *Id*. At the hearing, Kmart presented no new evidence, but only moved to submit the evidence it had already submitted with its motion, including Kaselitz's affidavit. *Id*. at 564. Ramirez testified at the hearing that although she had viewed other Kmart policies electronically, she did not log in through Kmart's online portal to view an arbitration agreement, did not click on a screen acknowledging receipt of the policy, and had never been presented with an arbitration agreement at any time during her employment. *Id*. The trial court denied Kmart's motion to compel arbitration and the court of appeals affirmed. *Id*. at 571.

The court of appeals did "not believe the mere existence of an electronic record can conclusively establish a person undertook an 'act,' particularly in light of a person's sworn denial." *Id*. at 568 & n.6. Further, "Ramirez's denial was sufficient to raise a fact issue that the trial court

could resolve" as to whether she assented to the arbitration provision. *Id*. at 569. Aerotek's counsel have ably catalogued the similarities and differences between the facts here and those in *Kmart*. We do not believe any merits disturbing the trial court's order.

We begin by addressing Aerotek's contentions that it presented "uncontested evidence regarding the physical impossibility of completing the onboarding paperwork without electronically signing the Mutual Arbitration Agreement" and showed "the physically impossible denials in [appellees'] declarations to be incompetent and, thus, 'no evidence.'" Marsh never testified that completing the onboarding paperwork without electronically signing the arbitration agreement was "physically impossible," nor did her testimony provide the basis for such a conclusion. "Testimony by an interested witness may establish a fact as a matter of law only if the testimony could be readily contradicted if untrue, and is clear, direct and positive, and there are no circumstances tending to discredit or impeach it." *Lofton v. Tex. Brine Corp.*, 777 S.W.2d 384, 386 (Tex. 1989); *Kmart*, 510 S.W.3d at 570; *see also Hunsucker v. Omega Indus.*, 659 S.W.2d 692, 697 (Tex. App.—Dallas 1983, no writ) (employee of party is "interested witness").

When asked, "Do you *know of* any other way that that name could appear on that disclosure document or any of the others that are in your hand if an individual didn't go online and go through the process that you've described for the Court?" she responded, "You know, not that I can think of." (emphasis added). Also, when asked, "So if these individuals did what they said in their affidavit . . . is there any possible way that you can imagine that they could have done that without executing the arbitration agreement?" she responded, "Not with this process." Additionally, Marsh described and demonstrated how the system can be used to access records in a database showing the date and time documents were purportedly signed electronically. But Marsh admitted she "is not currently in IT," is "not an IT expert," did not do any of the computer programming respecting the onboard processing system, and does not "do the development of" the system. She stated she

"work[s] with our IT department to manage this process." The trial court may have concluded Marsh had insufficient capacity to establish the system was failsafe.

Further, the trial court would have been well within its discretion to discredit Marsh's testimony. She was an interested witness—an Aerotek manager and near-twenty-year employee working at the company's corporate office. *See Hunsucker*, 659 S.W.2d at 697. And, she lacked expertise and involvement in the IT and programming aspects of the system. The trial court may have had demeanor- or credibility-based reasons supporting discrediting her testimony. *See Lofton*, 777 S.W.2d at 386. In line with this discussion, we conclude nothing in Harper's testimony would change our conclusion as to appellee Allen. Marsh's testimony applies to much of the analysis as to Allen, and Harper's total lack of specific memory as to her dealings with him provides no basis for a different conclusion as to him.

There is insufficient authority to support Aerotek's contention that Marsh's other testimony—that the onboarding process required passwords, user IDs, and security questions—required the conclusion that the electronic records described above constituted conclusive evidence of an arbitration agreement. Marsh never vouched for the records' integrity, nor could she adequately explain the security measures Aerotek took. *See Kmart*, 510 S.W.3d at 570 n.6. Marsh admitted Aerotek contracted with a vendor to create the onboarding system. Aerotek did not bring a witness from that vendor to provide technical explanation and vouch for system security.

In a similar situation, our sister court rejected Kmart's contention that its electronic records constituted conclusive evidence as a matter of law where, although Kmart's evidence showed users were required to enter user ID and password information and follow hyperlinks, Kmart's witness "never vouche[d] for the integrity of those records or explain[ed] any security measures Kmart uses to ensure its computer systems or software cannot be tampered with." *See id.* at 570 & n.6; *see also Alorica v. Tovar*, 569 S.W.3d 736, 742–43 (Tex. App.—El Paso 2018, no pet.) (rejecting

employer's contention that employee must "explain how it was that her log-in credentials could have been used by someone else," and concluding that where employer did not demonstrate "how [employer's] I.T. security set-up differed at all from the one employed in *Kmart*," evidence was not "sufficient to defeat an employee's sworn lack-of-notice claim as a matter of law"). Aerotek's evidence was less compelling: people onboarding with Aerotek can, from anywhere, create their ID and password, and can also log in from anywhere. *Cf. Alorica*, 569 S.W.3d at 742 (describing requirement that users "pass through two log-in hurdles": log-in to "network generally" and additional log-in to "portal" using different ID/password combination). Absent other evidence on system security, the trial court was within its discretion in finding Aerotek's evidence was not conclusive.[5] *See City of Keller*, 168 S.W.3d at 815–16 ("Evidence is conclusive only if reasonable people could not differ in their conclusions . . . . Undisputed evidence and conclusive evidence are not the same—undisputed evidence may or may not be conclusive, and conclusive evidence may or may not be undisputed.").

Part of Aerotek's argument addresses the Texas Business and Commerce Code's provision discussing the "attribution and effect of electronic record[s] and electronic signature[s]." TEX. BUS. & COM. CODE § 322.009. Aerotek suggests its evidence sufficiently proved all the appellees signed the arbitration agreements electronically. The Texas Uniform Electronic Transactions Act permits electronic signatures and other means to transact business, but "does so against the backdrop" of the common law of contracts without "supplanting that framework." *See Alorica*, 569 S.W.3d at 743–44. We are left with appellees' sworn denials, Aerotek's evidence suggesting they electronically signed the arbitration agreements, and the trial court's finding in appellees' favor.

---

[5] The dissent cites *Kyäni, Inc. v. HD Walz II Enterprises, Inc.*, No. 05-17-00486-CV, 2018 WL 3545072, at *4 (Tex. App.—Dallas July 24, 2018, no pet.) (mem. op.), in support of its assertion that "when considering testimony about such 'clickwrap' online agreements, this court has not required that the affiant demonstrate specialized or technical knowledge of the software design of the online portal used by the company." In *Kyäni*, this court reversed a trial court's denial of a motion to compel arbitration that was based on an electronic agreement. But *Kyäni*'s facts are distinguishable. Although the party moving to compel arbitration in *Kyäni* relied solely on an affidavit of its general counsel who demonstrated no technical software design knowledge, no evidence was submitted by the party seeking to avoid arbitration. *See id.* at *7.

We have no basis in the framework of appellate review to disturb the trial court's determination. *See Kmart*, 510 S.W.3d at 570 n.6; *Alorica*, 569 S.W.3d at 744.

Additionally, Aerotek argues that while the appellate court in *Kmart* "based its deference to the trial court's factual findings on the trial court's firsthand experience of the plaintiff/employee's live testimony," the appellees in this case "provided no such testimony" and "stood pat with the written declarations they had previously provided," "leaving this Court on equal footing with the trial court with respect to [appellees'] cold affidavit testimony." But Aerotek itself relies on the declarations as substantive evidence to support a finding essential to its position—that appellees "acknowledged receiving, reviewing online, and executing Aerotek's onboarding paperwork." That reliance weakens Aerotek's position. Moreover, in *Alorica*, our sister court specifically rejected an employer's attempt to distinguish *Kmart* based on a difference in "the quality of evidence" and stated (1) "the dispositive issue in *Kmart* did not necessarily hinge on live testimony-versus-affidavit" and (2) "[t]he distinction in the form with respect to how the evidence is presented is not material." *Alorica*, 569 S.W.3d at 742. Likewise, we reject Aerotek's argument that the distinction in form is material.

Aerotek's deference argument does not address or mention the parties' Rule 11 agreement, which Aerotek does not dispute is enforceable.[6] *See* TEX. R. CIV. P. 11. Based on the Rule 11 agreement—that the declarations "would be considered the same as live testimony as if provided in Court under oath"—and the trial court's acceptance of the declarations "as if such testimony had been presented live in Court," this case is distinguishable from the authority described in *Kmart* regarding the use of affidavits as evidence. In accordance with the parties' agreement, we

---

[6] During oral submission, Aerotek's counsel attempted to explain why the parties came to their Rule 11 agreement and also suggested what the terms of the agreement did and did not mean. A Rule 11 agreement is a contract. *See Shamrock Psychiatric Clinic, P.A. v. Tex. Dep't of Health & Human Servs.*, 540 S.W.3d 553, 560 (Tex. 2018). We construe an unambiguous contract on its face. *See id*. at 561. In addition to the fact that counsel never made these arguments in briefing, meaning we need not address them, we refuse to address them because the Rule 11 agreement is unambiguous on its face. *See id.*; *Backes v. Misko*, 486 S.W.3d 7, 21 n.3 (Tex. App.—Dallas 2015, pet. denied) (refusing to address argument raised for first time during oral submission).

consider the declarations "the same as live testimony." Thus, while the trial court may not have been able to assess appellees' physical demeanor on the witness stand, it certainly could assess their credibility relative to Aerotek's evidence and to that we must defer.

Finally, we are unconvinced by Aerotek's arguments claiming that affirmance here goes "beyond the corporate interests of Aerotek," "would jeopardize all electronically signed agreements," and "essentially means there are no enforceable agreements." Affirmance here does not go counter to preserving "the significance of contracts in the State of Texas." Nor does it, as the dissent contends, "amount[] to a state rule discriminating on its face against arbitration" or "treat agreements to arbitrate . . . less favorably than other contracts." Instead, affirming here follows years of precedent: a party seeking to enforce a contract must first prove it exists, starting with mutual assent. *See* RESTATEMENT (SECOND) OF CONTRACTS § 17 (1981).

Aerotek made the choice to forego in-person wet-ink signatures on paper contracts. This may be a good business decision that allows it to more efficiently process more business than otherwise possible. And in this case, Aerotek made the choice to bring only one person, an employee without apparent IT experience specific to the type of computer system whose technical reliability and security she sought to vouch for. Aerotek did this in the face of admitting it had contracted out creation and implementation of this system to another entity altogether and brought no witness from that entity. *Cf. Alorica*, 569 S.W.3d at 743.

We conclude Aerotek did not present evidence establishing the opposite of a vital fact, here that appellees' denials of ever seeing the arbitration contracts were physically impossible given Aerotek's computer system. *See City of Keller*, 168 S.W.3d at 827. The trial court may have given Aerotek's witness testimony minimal weight because neither witness had sufficient technical understanding of Aerotek's system, the infallibility of which was the entire basis for this appeal; it could have discredited Aerotek's employee-witnesses as interested. Appellees presented detailed

affidavits that Aerotek agreed to have the trial court accept as "live testimony," and the court could have credited these affidavits. In the light most favorable to the ruling, the trial court did not venture outside the broad zone of its discretion to deny Aerotek's motion to compel arbitration.[7]

### III. Conclusion

We decide against Aerotek on its sole issue and affirm the trial court's order.[8]

/Cory L. Carlyle/
CORY L. CARLYLE
JUSTICE

Bridges, J., dissenting

180579F.P05

---

[7] We have credited evidence favorable to appellees in this case, as we are required to do, because a reasonable factfinder could do so here. *See City of Keller*, 168 S.W.3d at 807. And we have disregarded contrary evidence, similarly concluding that a reasonable factfinder would *not* be in a position where it could *not* have disregarded contrary evidence. *See id*. Here, Aerotek points to the unlikeliness of four contractors on the same job with similar claims against appellants being represented by the same lawyer and having the same problem with its onboarding process. As we conclude, Aerotek's evidence did not establish the impossibility of this confluence, though we may have been similarly hesitant to reverse an order granting the motion to compel arbitration. As we note, Aerotek could have proven the impossibility, and may still convince a jury of appellees' claims' weaknesses. But under the ruling-deferential standard we must follow, we do not believe a factfinder would be unable to disregard contrary evidence, to the extent it exists here. *See id*. Though the dissent "would conclude the affidavits in this case were filed in bad faith and therefore constituted no evidence," that conclusion disregards the standard of review to which we are bound.

[8] Additionally, on May 30, 2018, this court stayed discovery in this case pending this appeal's resolution. We order that stay lifted.

–16–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

AEROTEK, INC. AND J.R. BUTLER, INC., Appellants

No. 05-18-00579-CV     V.

LERONE BOYD, MICHAEL MARSHALL, JIMMY ALLEN, AND TROJUAN CORNETT, Appellees

On Appeal from the 95th District Court, Dallas County, Texas
Trial Court Cause No. DC-18-00907.
Opinion delivered by Justice Carlyle. Justices Bridges and Partida-Kipness participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees LERONE BOYD, MICHAEL MARSHALL, JIMMY ALLEN, AND TROJUAN CORNETT recover their costs of this appeal from appellants AEROTEK, INC., AND J.R. BUTLER, INC.


Judgment entered this 27th day of August, 2019.